1  M. Anderson Berry, SBN 262879
   *aberry@justice4you.com*
2  Leslie Guillon, SBN 222400
   *lguillon@justice4you.com*
3  CLAYEO C. ARNOLD,
   A PROFESSIONAL LAW CORPORATION
4  865 Howe Avenue
   Sacramento, CA 95825
5  Telephone: (916) 777-7777
   Facsimile: (916) 924-1829
6
   Attorneys for Plaintiffs-Relators
7

**FILED**

Jul 12, 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

# SEALED

8              **UNITED STATES DISTRICT COURT**

9              **EASTERN DISTRICT OF CALIFORNIA**

10

11  UNITED STATES OF AMERICA *ex rel.*      Case No.: ___2:19-cv-1294 KJM KJN___
    Luis Franco and Monique Bryant,
12                                           **COMPLAINT FOR VIOLATIONS OF**
                 Plaintiffs,                 **THE FEDERAL FALSE CLAIMS ACT**
13
                 vs.                         **DEMAND FOR JURY TRIAL**
14
    Farmers' Rice Cooperative,
15                                           **FILED UNDER SEAL**
                 Defendant.                  (31 U.S.C. § 3729, *et seq.*)
16                                           (False Claims Act)

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT (FALSE CLAIMS ACT)

# COMPLAINT

This is an action brought on behalf of the United States by relators Luis Franco and Monique Bryant ("Relators"), by and through their attorneys, against Farmers' Rice Cooperative ("FRC" or "Defendant"), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729, *et seq*. ("FCA"). This action seeks to recover treble damages, civil penalties, and all other relief available for losses caused by FRC's fraud. Damages owed to the United States include, but are not limited to, the full value of all adulterated products that the United States would not have paid but for FRC's false claims that products were not unadulterated.

## I. PRELIMINARY STATEMENT

1.     To enrich itself at the expense of the United States, FRC has, since at least January 2008, conducted an unlawful scheme to supply the United States, including the military, with rice that fails to meet standards set by the United States Department of Agriculture and the Food and Drug Administration. FRC's rice was milled, stored and/or shipped in moldy, filthy, or otherwise unsanitary conditions. FRC knowingly supplied adulterated, non-compliant rice to the United States under contracts that required compliance with, among other regulations, the Food, Drug, and Cosmetic Act (21 U.S.C. § 301, *et seq*.), current good manufacturing practices (published in Title 21 part 110 of the Code of Federal Regulations), and the Federal Acquisition Regulations.

2.     FRC's non-compliant actions include, but are not limited to:

(i)     Milling, processing and packaging rice in moldy, filthy conditions;

(ii)     Storing rice in silos containing mold, "Found Microscopic Insects" ("FMI"), rice weevils, rodents, and other contaminates;

(iii)     Blending in lower quality and/or adulterated rice to increase the volume of more expensive rice, which resulted in false and deceptive certifications of rice grades;

(iv)     Violating minimum standards, which resulted in non-conforming goods and adulterated foods; and

(v)     Concealing the subpar quality of rice through misbranding, fraudulent labeling and packaging.

1

3.      Although Relators repeatedly raised their concerns to FRC management about mold, filth and improper blends, the unacceptable conditions, adulterations and improper blending did not stop.

4.      There is no amount of mold or filth allowed in rice. *See* FDA Defect Levels Handbook, Exhibit 1, p. 1. "Likewise, the mixing or blending of food with a defect at or above the current defect action level with another lot of the same or another food is not permitted. That practice renders the final food unlawful regardless of the defect level of the finished food." *Id.*

5.      Under 10 C.F.R. section 110.100(c):

> Compliance with defect action levels does not excuse violation of the requirement in section 402(a)(4) of the act that food not be prepared, packed, or held under unsanitary conditions or the requirements in this part that food manufacturers, distributors, and holders shall observe current good manufacturing practice. Evidence indicating that such a violation exists causes the food to be adulterated within the meaning of the act, even though the amounts of natural or unavoidable defects are lower than the currently established defect action levels. The manufacturer, distributor, and holder of food shall at all times utilize quality control operations that reduce natural or unavoidable defects to the lowest level currently feasible.

Importantly, the processing, milling, and storing of rice in moldy, filthy conditions that also contain insect fragments, rice weevils and rodents, violates minimum standards resulting in non-conforming goods and adulterated foods, as further detailed below.

6.      The FCA provides liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" or who otherwise improperly makes false statements to the government or to a government "contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government . . . (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. §§ 3729(a)(1)(A)-(G) and (b)(2)(A). Liability also arises for "reverse false claims," where any person "knowingly" concealed or "knowingly" and improperly avoided or decreased an obligation to reimburse the

2

COMPLAINT (FALSE CLAIMS ACT)

United States. 31 U.S.C. § 3729(a)(1)(G).

7.     Relators assert violations of federal law as a result of false claims made by Defendant in connection with the adulterated products. Relators acquired first-hand knowledge of these practices through their work at FRC, and through their daily inspections of the facilities and interactions with FRC employees with whom they worked for years.

8.     Upon information and belief, the United States would not have permitted FRC to supply government entities with FRC products had it been aware of FRC's false certifications of compliance with applicable contacts and/or the regulations set forth below.

## II. JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 31 U.S.C. §§ 3730(b), which confer jurisdiction of this Court over actions brought by private citizen plaintiffs under the False Claims Act.

10.     This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a), because Defendant transacts business and/or is found within the Eastern District of California.

11.     Venue in the Eastern District of California is proper pursuant to 28 U.S.C. 1391(b) and 31 U.S.C. § 3732, because Defendant transacts or transacted business in the Eastern District of California, and a substantial part of the events giving rise to the instant action occurred in the Eastern District of California.

12.     Relators are an "original source" and are otherwise authorized to maintain this action in the name of the United States as contemplated by the False Claims Act.

13.     None of the allegations set forth in this Complaint are based upon any public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, or from the news media.

14.     Relators will comply with the statutory requirements of 31 U.S.C. § 3730(b)(2)(3) by serving on the United States a copy of this sealed Complaint and a written disclosure statement of substantially all material evidence and information that Relators possess.

COMPLAINT (FALSE CLAIMS ACT)

15.     As required under the False Claims Act, this Complaint has been filed *in camera* and under seal and shall not be served on Defendant until the Court so orders.

### III. PARTIES

16.     Relator Luis Franco, a citizen of the United States and a resident of Yolo County, California, is suing in the name of and on behalf of the United States. For almost 25 years, Mr. Franco served as an employee at FRC, most recently as a Foreman and Miller, running a crew consisting of an Assistant Miller, Rice Transporters, Sweepers, and a Rice Grader. His primary duties included receiving the rice as it was delivered from the fields and processing the rice through various machines in the Mill so that the rice was ready to be packaged for delivery.

17.     Important aspects of Mr. Franco's duties were to attempt to ensure that the rice was milled in a sanitary manner, and to exercise quality control functions as the rice was sent from the Mill into the packaging facility. Mr. Franco obtained direct and independent knowledge of the fraudulent acts alleged in this Complaint, within the meaning of 31 U.S.C. § 3730(e)(4)(B), during his years of service with FRC.

18.     Relator Monique Bryant, a citizen of the United States and a resident of Sacramento County, California, is suing in the name of and on behalf of the United States. For over six years, Ms. Bryant served as an employee at FRC, most recently as a Distribution Superintendent in the Packaging Department.

19.     Ms. Bryant's duties included data entry, quality assurance, developing standard operating procedures, drafting accident/incident reports, employee training, and materials tracking throughout the facilities. Ms. Bryant obtained direct and independent knowledge of the fraudulent acts alleged in this Complaint, within the meaning of 31 U.S.C. § 3730(e)(4)(B), during her years of service with FRC.

20.     Defendant Farmers Rice Cooperative ("FRC") is a grower-owned rice marketing cooperative, with over 700 member-owners, which became a California corporation (No. C0194501) on March 24, 1944. At all times relevant herein, FRC was authorized to do business in, and conducted business in, California, with its headquarters in Sacramento, California. FRC's

COMPLAINT (FALSE CLAIMS ACT)

rice milling, packaging, and shipping facilities are adjacent to the Port of Sacramento, in West Sacramento, and FRC owns and operates three rice drying facilities in the Sacramento region.

21.     FRC processes and packages rice for other companies, including JFC International, Inc. (including the "Botan" and "Nishiki" tradenames), Wonder Rose, Golden State, Yuki No Mai, Asian Dragon, Illpummi and Farmers' Select and supplies several different varieties of rice and rice products, 100% grown in California, to over 65 countries. The "Diamond G" brand, on information and belief, is FRC's in-house brand, and is the brand primarily distributed by FRC to fulfill government contracts.

22.     California produces around 20 percent of the nation's rice in a typical year, and more than 95 percent of California's rice is grown in the Sacramento Valley. According to FRC, it is California's largest rice marketing firm, and processes and markets approximately 25 percent of all of the rice grown in California.[1]

### IV. FACTUAL BACKGROUND

**A.     Statutes and Regulations to Combat Fraud**

**1)  False Claims Act**

23.     The FCA prohibits the submission of false or fraudulent claims for payment to the United States or the making of false statements for the purpose of causing a false claim to be paid. A person who violates the FCA is liable to the United States for civil penalties and for three times the amount of the government's damages. 31 U.S.C. § 3729(a)(1).

24.     A violation of the FCA occurs when a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B).

25.     An FCA violation also occurs where a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or

---

[1]  *See* FRC's website, available at: http://www.farmersrice.com/who-we-are/about-us/ (last visited May 15, 2019).

5

decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

26.    One definition of "claim" under the FCA is "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that . . . is presented to an officer, employee, or agent of the United States." *Id.* § 3729(b)(2)(A)(i).

27.    A request or demand not directly presented to the government, however, is also a "claim" under the FCA. The FCA defines that term as:

> [A]ny request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that . . . is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(b)(2)(A)(ii). The section above was amended in 2009 when Congress amended the FCA in the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617.

28.    The FCA specifically excludes from the definition of "claim" only "requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property." *Id.* § 3729(b)(2)(B).

29.    The False Claims Act defines "knowing" and "knowingly" as follows:
> [T]he terms "knowing" and "knowingly"—
> (A) mean that a person, with respect to information—
>        (i) has actual knowledge of the information;
>        (ii) acts in deliberate ignorance of the truth or falsity of the information; or
>        (iii) acts in reckless disregard of the truth or falsity of the information; and
> (B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1).

6

COMPLAINT (FALSE CLAIMS ACT)

30.     The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The standard of proof under the FCA is preponderance of the evidence. 31 U.S.C. § 3731(d).

31.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, and 64 Fed. Reg. 47099, 47103 (1999), the FCA civil penalties were adjusted to $5,500 to $11,000 per false claim for violations occurring on or after September 29, 1999. The penalty range was increased to $11,181 to $22,363 effective January 29, 2018, with respect to violations occurring after November 2, 2015. 83 Fed. Reg. 3944 (2018).

**2) U.S. Food and Drug Administration and U.S. Dept. of Agriculture**

32.     FRC's business is milling, manufacturing, selling and distributing medium grain rice, along with brown rice, sweet rice and table rice. During Relators' employment, FRC sold various types and grades of rice, including "New Variety" rice, which was marketed to be the highest quality rice available.

33.     FRC sells rice under its own brands and for other companies, then distributes these products to customers through retail locations, online, and through brokers and warehouse whole-sellers, who in turn enter contracts with various government agencies, including but not limited to, the Defense Commissary Agency and USDA Farm Service Agency. FRC's rice is sold through federal commissaries in and outside the United States.

34.     The United States Food and Drug Administration ("FDA"), a U.S. Department of Health and Human Services agency, regulates products under its jurisdiction, such as food, drugs, and medical devices. Thus, FRC's facilities and food products are regulated by the FDA.

35.     FRC is also regulated by the United States Department of Agriculture ("USDA") under the 1985 Memorandum of Understanding ("MOU") between the FDA and the USDA-Federal Grain Inspection Service ("FGIS") (Document No. 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). Exhibit 2. Under this MOU, the FDA mandates FGIS officers to report inferior quality or unfit grain and/or other commodities, such as rice, to the FDA.

7

COMPLAINT (FALSE CLAIMS ACT)

36.     Moreover, upon information and belief, under contracts with federal agencies, FRC and its brokers promise to comply with all relevant federal and state regulations.

37.     The FDA enforces the Food, Drug, and Cosmetic Act (21 U.S.C. §§ 301, *et seq.*) (the "FDC Act"). Under 21 U.S.C. § 331(k), it is unlawful to adulterate any food product, or to introduce or receive such a product in interstate commerce.

> A food shall be deemed to be adulterated –
> If it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance such food shall not be considered adulterated under this clause if the quantity of such substance in such food does not ordinarily render it injurious to health. 21 U.S.C. § 342(a)(1).
>
> **A food shall also be deemed to be adulterated -**
> **if it has been prepared, packed, or held under insanitary conditions whereby it *may* have become contaminated with filth, or whereby it *may* have been rendered injurious to health**. 21 U.S.C. § 342(a)(4).[(emphases added.)]

38.     21 U.S.C. § 343 governs Misbranded food–
> A food shall be deemed to be misbranded—
> (a) False or misleading label
> If (1) its labeling is false or misleading in any particular, or (2) in the case of a food to which section 350 of this title applies, its advertising is false or misleading in a material respect or its labeling is in violation of section 350(b)(2) of this title.

### 3)  Current Good Manufacturing Practices

39.     Current good manufacturing practices ("cGMPs") are published in Title 21 part 110 of the Code of Federal Regulations. These cGMPs govern the methods, equipment, facilities, and controls for producing processed food. They regulate the minimum sanitary and processing requirements for producing safe and wholesome food and also serve as a basis for FDA inspections.

40.     If a contract requires compliance with the FDA Act or other federal regulations, then compliance with cGMPs is required. Food processors such as FRC must adhere to the cGMP provided by FDA regulations. The cGMP standards are applied in determining whether food is adulterated under the Act. *See* 21 C.F.R. § 110.5(a).

41.     Title 21 C.F.R. § 110.110 permits the FDA to establish maximum levels of natural or unavoidable defects in foods:

COMPLAINT (FALSE CLAIMS ACT)

Poor manufacturing practices may result in enforcement action without regard to the action level. Likewise, the mixing [or] blending of food with a defect at or above the current defect action level with another lot of the same or another food is not permitted. That practice renders the final food unlawful regardless of the defect level of the finished food.

Exhibit 1, p. 1. This is exactly the type of violation that FRC has been engaging in for years by

milling, processing, packaging and shipping rice in unsanitary conditions.

42.    Relevant cGMPs include the following:

**21 C.F.R. § 110.20 governs buildings and facilities:**

(a) Grounds. The grounds about a food plant under the control of the operator shall be kept in a condition that will protect against the contamination of food. The methods for adequate maintenance of grounds include, but are not limited to:

(1) Properly storing equipment, removing litter and waste, and cutting weeds or grass within the immediate vicinity of the plant buildings or structures that may constitute an attractant, breeding place, or harborage for pests.

(2) Maintaining roads, yards, and parking lots so that they do not constitute a source of contamination in areas where food is exposed.

(3) Adequately draining areas that may contribute contamination to food by seepage, foot-borne filth, or providing a breeding place for pests.

(4) Operating systems for waste treatment and disposal in an adequate manner so that they do not constitute a source of contamination in areas where food is exposed. …

(b) Plant construction and design. Plant buildings and structures shall be suitable in size, construction, and design to facilitate maintenance and sanitary operations for food-manufacturing purposes. The plant and facilities shall:

(1) Provide sufficient space for such placement of equipment and storage of materials as is necessary for the maintenance of sanitary operations and the production of safe food.

(2) Permit the taking of proper precautions to reduce the potential for contamination of food, food-contact surfaces, or food-packaging materials with microorganisms, chemicals, filth, or other extraneous material. The potential for contamination may be reduced by adequate food safety controls and operating practices or effective design, including the separation of operations in which contamination is likely to occur, by one or more of the following means: location, time, partition, air flow, enclosed systems, or other effective means.

9

COMPLAINT (FALSE CLAIMS ACT)

…

(4) Be constructed in such a manner that floors, walls, and ceilings may be adequately cleaned and kept clean and kept in good repair; that drip or condensate from fixtures, ducts and pipes does not contaminate food, food-contact surfaces, or food-packaging materials; and that aisles or working spaces are provided between equipment and walls and are adequately unobstructed and of adequate width to permit employees to perform their duties and to protect against contaminating food or food-contact surfaces with clothing or personal contact.

(5) Provide adequate lighting in hand-washing areas, dressing and locker rooms, and toilet rooms and in all areas where food is examined, processed, or stored and where equipment or utensils are cleaned; and provide safety-type light bulbs, fixtures, skylights, or other glass suspended over exposed food in any step of preparation or otherwise protect against food contamination in case of glass breakage.

…

(7) Provide, where necessary, adequate screening or other protection against pests.

43. **21 C.F.R. § 110.35 governs sanitary operations:**

(a) General maintenance. Buildings, fixtures, and other physical facilities of the plant shall be maintained in a sanitary condition and shall be kept in repair sufficient to prevent food from becoming adulterated within the meaning of the act. Cleaning and sanitizing of utensils and equipment shall be conducted in a manner that protects against contamination of food, food-contact surfaces, or food-packaging materials.

(b) Substances used in cleaning and sanitizing; storage of toxic materials.

(1) Cleaning compounds and sanitizing agents used in cleaning and sanitizing procedures shall be free from undesirable microorganisms and shall be safe and adequate under the conditions of use. Compliance with this requirement may be verified by any effective means including purchase of these substances under a supplier's guarantee or certification, or examination of these substances for contamination. Only the following toxic materials may be used or stored in a plant where food is processed or exposed:

(i) Those required to maintain clean and sanitary conditions;

(ii) Those necessary for use in laboratory testing procedures;

(iii) Those necessary for plant and equipment maintenance and operation; and

(iv) Those necessary for use in the plant's operations.

10

COMPLAINT (FALSE CLAIMS ACT)

(c) Pest control. No pests shall be allowed in any area of a food plant. Guard or guide dogs may be allowed in some areas of a plant if the presence of the dogs is unlikely to result in contamination of food, food-contact surfaces, or food-packaging materials. Effective measures shall be taken to exclude pests from the processing areas and to protect against the contamination of food on the premises by pests. The use of insecticides or rodenticides is permitted only under precautions and restrictions that will protect against the contamination of food, food-contact surfaces, and food-packaging materials.

(d) Sanitation of food-contact surfaces. All food-contact surfaces, including utensils and food-contact surfaces of equipment, shall be cleaned as frequently as necessary to protect against contamination of food.

(1) Food-contact surfaces used for manufacturing or holding low-moisture food shall be in a dry, sanitary condition at the time of use. When the surfaces are wet-cleaned, they shall, when necessary, be sanitized and thoroughly dried before subsequent use.

…

(3) Non-food-contact surfaces of equipment used in the operation of food plants should be cleaned as frequently as necessary to protect against contamination of food.

…

(5) Sanitizing agents shall be adequate and safe under conditions of use. Any facility, procedure, or machine is acceptable for cleaning and sanitizing equipment and utensils if it is established that the facility, procedure, or machine will routinely render equipment and utensils clean and provide adequate cleaning and sanitizing treatment.

44. **21 C.F.R. § 110.37 governs sanitary facilities and controls:**

Each plant shall be equipped with adequate sanitary facilities and accommodations including, but not limited to:

…

(b) Plumbing. Plumbing shall be of adequate size and design and adequately installed and maintained to:

…

(3) Avoid constituting a source of contamination to food, water supplies, equipment, or utensils or creating an unsanitary condition.
(4) Provide adequate floor drainage in all areas where floors are subject to flooding-type cleaning or where normal operations release or discharge water or other liquid waste on the floor.

COMPLAINT (FALSE CLAIMS ACT)

(5) Provide that there is not backflow from, or cross-connection between, piping systems that discharge waste water or sewage and piping systems that carry water for food or food manufacturing.

(c) Sewage disposal. Sewage disposal shall be made into an adequate sewerage system or disposed of through other adequate means.

(d) Toilet facilities. Each plant shall provide its employees with adequate, readily accessible toilet facilities. Compliance with this requirement may be accomplished by:

(1) Maintaining the facilities in a sanitary condition.

(2) Keeping the facilities in good repair at all times.

(3) Providing self-closing doors.

(4) Providing doors that do not open into areas where food is exposed to airborne contamination, except where alternate means have been taken to protect against such contamination (such as double doors or positive air-flow systems).

(e) Hand-washing facilities. Hand-washing facilities shall be adequate and convenient and be furnished with running water at a suitable temperature. Compliance with this requirement may be accomplished by providing:

(1) Hand-washing and, where appropriate, hand-sanitizing facilities at each location in the plant where good sanitary practices require employees to wash and/or sanitize their hands.

(2) Effective hand-cleaning and sanitizing preparations.

(3) Sanitary towel service or suitable drying devices.

(4) Devices or fixtures, such as water control valves, so designed and constructed to protect against recontamination of clean, sanitized hands.

(5) Readily understandable signs directing employees handling unprotected food, unprotected food-packaging materials, of food-contact surfaces to wash and, where appropriate, sanitize their hands before they start work, after each absence from post of duty, and when their hands may have become soiled or contaminated. These signs may be posted in the processing room(s) and in all other areas where employees may handle such food, materials, or surfaces.

(6) Refuse receptacles that are constructed and maintained in a manner that protects against contamination of food.

45.   **21 C.F.R. § 110.80 governs processes and controls:**

All operations in the receiving, inspecting, transporting, segregating, preparing, manufacturing, packaging, and storing of food shall be conducted in accordance with adequate sanitation principles. Appropriate quality control operations shall be employed to ensure that food is suitable for human consumption and that food-packaging materials are safe and suitable. Overall sanitation of the plant shall be under the supervision of one or more competent individuals assigned responsibility for this function. All reasonable precautions shall be taken to ensure that production procedures do not contribute contamination from any source. Chemical, microbial, or extraneous-material testing procedures shall be used where necessary to identify sanitation failures or possible food contamination. All food that has become contaminated to the extent that it is adulterated within the meaning of the act shall be rejected, or if permissible, treated or processed to eliminate the contamination.

COMPLAINT (FALSE CLAIMS ACT)

(a) Raw materials and other ingredients. (1) Raw materials and other ingredients shall be inspected and segregated or otherwise handled as necessary to ascertain that they are clean and suitable for processing into food and shall be stored under conditions that will protect against contamination and minimize deterioration. Raw materials shall be washed or cleaned as necessary to remove soil or other contamination. Water used for washing, rinsing, or conveying food shall be safe and of adequate sanitary quality. Water may be reused for washing, rinsing, or conveying food if it does not increase the level of contamination of the food. Containers and carriers of raw materials should be inspected on receipt to ensure that their condition has not contributed to the contamination or deterioration of food.

(2) Raw materials and other ingredients shall either not contain levels of microorganisms that may produce food poisoning or other disease in humans, or they shall be pasteurized or otherwise treated during manufacturing operations so that they no longer contain levels that would cause the product to be adulterated within the meaning of the act. Compliance with this requirement may be verified by any effective means, including purchasing raw materials and other ingredients under a supplier's guarantee or certification.
…

(4) Raw materials, other ingredients, and rework susceptible to contamination with pests, undesirable microorganisms, or extraneous material shall comply with applicable Food and Drug Administration regulations and defect action levels for natural or unavoidable defects if a manufacturer wishes to use the materials in manufacturing food. Compliance with this requirement may be verified by any effective means, including purchasing the materials under a supplier's guarantee or certification, or examination of these materials for contamination.

(5) Raw materials, other ingredients, and rework shall be held in bulk, or in containers designed and constructed so as to protect against contamination and shall be held at such temperature and relative humidity and in such a manner as to prevent the food from becoming adulterated within the meaning of the act. Material scheduled for rework shall be identified as such.
…

(b) Manufacturing operations. (1) Equipment and utensils and finished food containers shall be maintained in an acceptable condition through appropriate cleaning and sanitizing, as necessary. Insofar as necessary, equipment shall be taken apart for thorough cleaning.

(2) All food manufacturing, including packaging and storage, shall be conducted under such conditions and controls as are necessary to minimize the potential for the growth of microorganisms, or for the contamination of food. One way to comply with this requirement is careful monitoring of physical factors such as time, temperature, humidity, aw, pH, pressure, flow rate, and manufacturing operations such as freezing, dehydration, heat processing, acidification, and refrigeration to ensure that mechanical breakdowns, time delays, temperature fluctuations, and other factors do not contribute to the decomposition or contamination of food.

13

COMPLAINT (FALSE CLAIMS ACT)

…

(6) Effective measures shall be taken to protect finished food from contamination by raw materials, other ingredients, or refuse. When raw materials, other ingredients, or refuse are unprotected, they shall not be handled simultaneously in a receiving, loading, or shipping area if that handling could result in contaminated food. Food transported by conveyor shall be protected against contamination as necessary.

(7) Equipment, containers, and utensils used to convey, hold, or store raw materials, work-in-process, rework, or food shall be constructed, handled, and maintained during manufacturing or storage in a manner that protects against contamination.

(8) Effective measures shall be taken to protect against the inclusion of metal or other extraneous material in food. Compliance with this requirement may be accomplished by using sieves, traps, magnets, electronic metal detectors, or other suitable effective means.

(9) Food, raw materials, and other ingredients that are adulterated within the meaning of the act shall be disposed of in a manner that protects against the contamination of other food. If the adulterated food is capable of being reconditioned, it shall be reconditioned using a method that has been proven to be effective or it shall be reexamined and found not to be adulterated within the meaning of the act before being incorporated into other food.

(10) Mechanical manufacturing steps such as washing, peeling, trimming, cutting, sorting and inspecting, mashing, dewatering, cooling, shredding, extruding, drying, whipping, defatting, and forming shall be performed so as to protect food against contamination. Compliance with this requirement may be accomplished by providing adequate physical protection of food from contaminants that may drip, drain, or be drawn into the food. Protection may be provided by adequate cleaning and sanitizing of all food-contact surfaces, and by using time and temperature controls at and between each manufacturing step.
…

(13) Filling, assembling, packaging, and other operations shall be performed in such a way that the food is protected against contamination. Compliance with this requirement may be accomplished by any effective means, including:

(i) Use of a quality control operation in which the critical control points are identified and controlled during manufacturing.

(ii) Adequate cleaning and sanitizing of all food-contact surfaces and food containers.

(iii) Using materials for food containers and food- packaging materials that are safe and suitable, as defined in 130.3(d) of this chapter.

(iv) Providing physical protection from contamination, particularly airborne contamination.

14

(v) Using sanitary handling procedures.

(14) Food such as, but not limited to, dry mixes, nuts, intermediate moisture food, and dehydrated food, that relies on the control of aw (water activity) for preventing the growth of undesirable microorganisms shall be processed to and maintained at a safe moisture level. Compliance with this requirement may be accomplished by any effective means, including employment of one or more of the following practices:

(i) Monitoring the aw of food.

(ii) Controlling the soluble solids-water ratio in finished food.

(iii) Protecting finished food from moisture pickup, by use of a moisture barrier or by other means, so that the aw of the food does not increase to an unsafe level.
…

(17) Food-manufacturing areas and equipment used for manufacturing human food should not be used to manufacture nonhuman food-grade animal feed or inedible products, unless there is no reasonable possibility for the contamination of the human food**.**

46.    **21 C.F.R. § 110. § 110.93 governs warehousing and distribution:**

Storage and transportation of finished food shall be under conditions that will protect food against physical, chemical, and microbial contamination as well as against deterioration of the food and the container.

### 4)  USDA's Standards for Milled Rice

47.    The USDA's Grain Inspection, Packers and Stockyards Administration, which governs FGIS, has its own set of standards for rough rice, brown rice, and milled rice. Contracts within the USDA Farm Service Agency programs, for example, are required to follow the terms and conditions of the Master Solicitation for Commodity Procurements and the USDA Commodity Requirements Rice Products for Use in Domestic Programs, which include that rice delivered shall meet the specifications of the class and grade offered as defined in the "United States Standards for Milled Rice" in effect on the date the solicitation is issued.

48.    Under the General Regulations and Standards for Certain Agricultural Commodities, Title 7 C.F.R. § 868, *et seq*., section 868.301 defines milled rice: "Whole or broken kernels of rice (Oryza sativa L.) from which the hulls and at least the outer bran layers have been

COMPLAINT (FALSE CLAIMS ACT)

removed and which contain no more than 10.0 percent of seeds, paddy kernels, or foreign material, either singly or combined."

49.      Section 868.302 defines other terms for the purposes of these standards, including:

(d) Classes….

…

(2) "Medium grain milled rice"' shall consist of milled rice which contains more than 25.0 percent of whole kernels of milled rice and in U.S. Nos. 1 through 4 not more than 10.0 percent of whole or broken kernels of long grain rice or whole kernels of short grain rice. U.S. No. 5 and U.S. No 6 medium grain milled rice shall contain no more than 10.0 percent of whole kernels of long or short grain milled rice (broken kernels do not apply).

## B.      Federal Agencies That Contracted for Rice Produced by Defendant

50.      FRC caused the submission of false claims for payment by the United States by supplying government agencies with rice that failed to satisfy USDA, FDA, cGMPs, and other regulations, including but not limited to: (1) rice milled, processed and packaged in moldy, filthy conditions; (2) rice stored in silos containing mold, "Found Microscopic Insects" ("FMI"), rice weevils, rodents, and other contaminates; (3) rice blended with lower quality rice and/or adulterated rice, which resulted in false and deceptive certifications of rice grades; (4) rice shipments that violated minimum standards, which resulted in non-conforming goods and adulterated foods; and (5) deceptively concealing the subpar quality of rice through misbranding, fraudulent labeling and packaging.

51.      Relators cannot at this time identify all of the false claims for payment that were caused by Defendant's conduct. FRC used various brokers and other entities, including EJP International, Inc. and Coastal Pacific Food Distribution, Inc., among others, to contract with government agencies to supply FRC-produced rice. FRC-produced rice included FRC's in-house brand, Diamond G, and various other brands, including but not limited to, JFC International, Inc.'s brands (*e.g.*, Nishiki and Botan).

52.      In addition, upon information and belief, FRC contracted directly with government agencies, including USDA agencies.

COMPLAINT (FALSE CLAIMS ACT)

53.     Thus, the false claims were submitted by numerous separate persons in California and across the United States, and over several years. Relators have no control over, or dealings with, such entities and have no access to the records which are in Defendant's possession. Relators have, however, provided first-hand knowledge that these claims exist, as further detailed below.

54.     During their years working for FRC, Relators were told that FRC supplied its in-house brand, Diamond G, and other branded rice to United States military and other governmental entities around the world. Diamond G rice was packaged in large, distinctive packing with either blue bags with white print or yellow bags with blue print. Each bag exhibited a distinctive brand logo and any other specialized markings which the order may have required.

55.     FRC employees were instructed by management, including Andrew Brutlag in FRC's Quality Assurance Dept., that any rice could be used to fill the "military orders" and as such, the rice going to the military was generally out of grade. FRC's rationale was that Diamond G was an FRC product, and therefore FRC could mill and package it however it saw fit.

56.     Relator Franco recalls countless FRC shipments for the military made to Stockton, California, for further distribution to the military. Relator Bryant also recalls military orders of FRC rice being shipped to San Diego, Hawaii, Guam and American Samoa.

1)  **Defense Commissary Agency**

57.     At least some of the rice destined to commissaries was purchased by the Defense Commissary Agency ("DeCA"), which operates a chain of worldwide commissaries to provide groceries and other items to active-duty military personnel, retirees, and their families in safe and protected locations. Commissaries are premised upon the idea of providing a "taste of home" to military personnel and their family members wherever they are stationed.

58.     An example of one of the many contracts DeCA entered into for FRC-produced rice was awarded to EJP International, Inc. ("EJP International") on December 1, 2013, effective through November 30, 2018. Along with other items, DeCA ordered dozens of cases of Diamond G brown rice, medium grain Calrose, Brown #5, and New Variety Premium rice. Exhibit 3.

COMPLAINT (FALSE CLAIMS ACT)

59.     Contracts issued by DeCA, including this example, incorporate FAR 52.212-4, codified as 48 C.F.R. 52.212-4, which includes the following important terms:

a.     Section (a) states, in part, "the Contractor shall only tender for acceptance those items that conform to the requirements of this contract."

b.     Section (o) states, "[t]he Contractor warrants and implies that the items delivered hereunder are merchantable and fit for use for the particular purpose described in this contract."

c.     Section (q) states, "[t]he Contractor shall comply with all applicable Federal, State, and local laws, executive orders, rules and regulations applicable to its performance under this contract."

d.     Section (v) states, "[t]he Contractor's representations and certifications, including those completed electronically via the System for Award Management (SAM), are incorporated by reference into the contract." Exhibit 4.[2]

## 2)  USDA Farm Service Agency

60.     The Farm Service Agency ("FSA") is the USDA agency which has merged with several programs and agencies in an effort to implement farm conservation and regulation laws around the country. One of the primary purposes of the FSA is to administer farm commodity loan and purchase programs in order to maintain a functioning self-sustaining food supply in the United States.

61.     The FSA offers several different types of assistance programs. FSA's Commodity Operations Program assists with the purchasing and delivering of processed commodities under various domestic distribution programs, such as the National School Lunch, Commodity Supplemental Food, Food Distribution on Indian Reservations, and Disaster Assistance Programs.

62.     Food delivery through this program is required to follow the terms and conditions of the Master Solicitation for Commodity Procurements and the USDA Commodity Requirements Rice Products for Use in Domestic Programs, including that rice be enriched (other

---

[2] *See* https://www.law.cornell.edu/cfr/text/48/52.212-4 (last visited May 16, 2019).

COMPLAINT (FALSE CLAIMS ACT)

than Brown rice), and that all rice products for delivery in Hawaii shall be U.S. No. 1 Medium Grain California grown only. Exhibit 5.

63.     In one example of FRC's dealings with the FSA, since at least 2004, FRC defrauded the United States under contracts with the FSA for enriched rice destined to the Hawaii Department of Education, Hawaii Child Nutrition Programs. Exhibit 6. Rather than delivering under the contracted requirements, Defendant delivered non-conforming rice.

64.     The following is a sample of contracts between FRC and the USDA/FSA for milled U.S. #1 medium grain enriched rice:

| Date | Summary | Action Obligation | Quantity (pounds) |
|------|---------|-------------------|-------------------|
| 02/25/09 | VDOD07187 Contract Award Notice | $163,703.40 | 210,000 |
| 11/19/08 | VDOD07113 Contract Award Notice | $163,081.81 | 252,000 |
| 08/27/08 | VDOD07057 Contract Award Notice | $126,789.60 | 168,000 |
| 06/19/08 | VDOD07043 Contract Award Notice | $102,034.80 | 126,000 |
| 03/05/08 | VVEPD05651 | $1,785,254.00 | Unknown |
| 02/06/08 | VVEPD05641 | $1,189,725.00 | Unknown |
| 01/09/08 | VDOD06938 Contract Award Notice | $114,823.85 | 210,000 |

**3) Coastal Pacific Food Distribution Inc.**

65.     The DeCA and other governmental agencies also obtain food and non-food items for commissaries and other supply chain needs through Coastal Pacific Food Distribution, Inc. ("CPFD"), which has a shipping facility in Stockton, California. Mr. Franco observed countless shipments of adulterated rice destined to this distributor.

66.     CPFD is the second largest military distributor of food and related products, providing full-line service throughout the Western United States, Alaska, Hawaii, Guam, Japan, Okinawa, Korea, Singapore, Kwajalein, the Philippines, and the Indian Ocean. It is a provider of logistics services to government agencies and companies who require procurement and supply chain capabilities to support their customers within the United States and other parts of the world. CPFD services all 78 commissaries west of the Rocky Mountains, as well as the DeCA-operated

19

COMPLAINT (FALSE CLAIMS ACT)

central distribution centers in Guam, Japan and Korea.[3]

67.     An example of one of the many shipments FRC delivered to CPFD, brokered by EJP International, was scheduled for August 30, 2013. EJP International contracted with CPFD for 37,924 pounds of Diamond G rice, including Calrose and Imperial Rose grades. Exhibit 7. On information and belief, CPFD entered into contracts with DeCA or other government agencies that included compliance with 48 C.F.R. 52.212-4 and similar regulations.

C.     **FRC's Rice Milling and Packaging Processes**

68.     FRC's rice comes from its member-owners as rice paddies from fields throughout California. Once at the facilities, the rice, still in the husk, is sampled and tested for moisture, insects and different types of damage.  The rice is dumped on to dryers, which is similar to a silo, which dries the rice via a heat source. The rice is then cleaned and stored within the warehouse, where it remains for a tempering process to continue to pull moisture out of the rice. After tempering, the rice is transferred to storage silos for milling.

69.     Milling is a crucial step in post-production of rice. The objective of a rice milling system is to remove the husk and the bran layers, and produce an edible rice kernel that is sufficiently milled and free of impurities.

70.     Removing the bran, which is called the whitening process, typically takes multiple cycles until complete removal of color. Thereafter, the rice is run through a color sorter, a machine called the Sortex, which is designed to recognize and remove defective kernels. Importantly, for the Sortex to function properly, it needs to be set on the proper rice grade selection. If New Variety was being milled, for example, FRC employees were told to place the selection on the Extra Fancy setting, a lower quality of rice. This was done because if the Sortex ran on Extra Fancy, more rice would be accepted. Keeping the lower quality rice in meant more "higher" quality rice was produced and sold for undeserved profit.

71.     Each type of rice is then stored in silos until the rice is sent to the packaging department. The rice travels down a conveyor belt system, that should be enclosed, which moves

---

[3] *See* http://www.cpfd.com (last visited May 16, 2019).

COMPLAINT (FALSE CLAIMS ACT)

the rice from the silo to the packaging department. Relator Bryant has firsthand knowledge that during the warmer months, the conveyor belt was usually uncovered, thus leaving the rice exposed to bugs and other elements during the transfer from building to building.

72. FRC's packaging department packages the finished product and seals the bags, applies the product code to the bags using a laser coder, as well as other special markings that the customer may have requested when submitting the order. The most common packaged sizes are 50-, 20-, 10-, 5- and 2- pound bags.

73. Massive orders could be fulfilled through "totes" which were 1000 kilogram bags. The tote bag is connected to a spout and weighed. When it reaches the required weight the top is tied and the tote is stacked in the warehouse.

74. Should the contract call for enriched rice, the rice is processed according to the same procedures as milled rice, but the Miller adds a pre-designated percentage of nutrients just before packaging, as specified in the Code of Federal Regulations. 21 C.F.R. 137.350.

**D.** **Relator Bryant's Personal Knowledge of Product Adulteration at FRC**

75. Ms. Bryant began working for FRC in the data entry, quality assurance and packaging departments in or about January 2009. In 2010, she was promoted to Supervisor with additional duties including standard operating procedures, accident/incident report writing, employee training and materials tracking, with additional training to serve as a backup manager for Hector Ramirez, the Supervisor of Operations.

76. In 2013, Ms. Bryant started inspecting Mill 2 approximately once per month. Manuel Martinez, a Quality Control Supervisor, trained Ms. Bryant for these inspections, describing the process as starting on the bottom floor of the mill, in the special processing area, then inspecting each floor. If areas, machines and/or parts of the facility were out of compliance, Ms. Bryant was to take photos and include them in an email report to all department heads using FRC's intranet.

COMPLAINT (FALSE CLAIMS ACT)

77.    Throughout the facility Ms. Bryant observed, among many other things, dirty rags inserted into camolino oil barrels, [4] leaking roofs and pipes, damp wiring, damp walls, other condensation, mold and FMI. Exhibits 8-11.

78.    The photo below depicts a screw that is filled with mold. Exhibit 12.  The lower part of the photo shows the open flap of the screw coated with mold, which, when closed, wraps around and encloses the screw which carries the rice.  Each flap is approximately four feet wide. Again, screws like this move rice from one place to another – rice that has already been "cleaned."



79.    Ms. Bryant observed similar violations throughout Mill 1, but despite her detailed inspections and reports to upper management – which she supplemented with further reporting and documentation – little, if anything was done by FRC to fix the violations. Exhibit 13.

80.    Aside from her monthly inspections, Ms. Bryant observed and reported other violations throughout the FRC facility. For example, in the finished goods area, rice was to be graded directly from the transfer belt. When rice was placed "on hold" due to it being out of grade or where mold was found, it was simply placed into totes and returned to the Sortex machine to be re-milled, with the hopes of it not failing tests again.

---

[4] Camolino is an oil used to coat the rice to provide a glossiness once cooked.

COMPLAINT (FALSE CLAIMS ACT)

81.   FMI was commonly discovered throughout the facility and not addressed. In one example, FRC line operator Zoua Thao found FMI ("(live, dead & larvae)") in the exact same area FMI was located the week before. *See* Exhibit 14.

82.   Bug larvae were also found in rice ready to be shipped out. *See, e.g.*, Exhibit 15. In one instance, in or about 2014-2015, a line operator showed Ms. Bryant that if the rice was





warmed using a flash light, the translucent bug larvae would wriggle.

83.   Ms. Bryant had more specific examples, however, when FRC terminated her in or about April 2015, FRC seized her belongings, including her personal cell phone and a flash drive where Ms. Bryant kept photos, videos and other information documenting FRC's systemwide unsanitary conditions.

//

COMPLAINT (FALSE CLAIMS ACT)

**E.**  **Relator Franco's Personal Knowledge of Product Adulteration at FRC and Relators' Efforts to Stop the Violations**

84.     Relator Franco began his career at FRC in 1988 as a rice sweeper on a milling crew in FRC's West Sacramento facilities. At the direction of the Miller, Mr. Franco would "sweep" rice, which meant moving it through the screws down the line at Mill 1.

85.     In 1993, he was promoted to export and bagging in the packaging room. From there he was promoted to Miller.

86.     In 2003, Mr. Franco was transferred to FRC's only other mill, Mill 2, which used a newer rice milling system. Over the years, Mr. Franco was transferred back and forth between Mills 1 and 2 as a Foreman or as a Miller. He supervised teams consisting of an Assistant Miller, Rice Transporters, Sweepers and Rice Graders.

87.     At the beginning of each shift, Mr. Franco walked his work space and evaluated it, as outlined in FRC's "Pre-shift Worksheet," documenting his observations on the worksheet. This would take at least one half-hour per shift.

88.     For each shift, FRC supplied him with a "Blend Sheet," which instructed him how to mill and blend the rice batches for that particular shift. The blend was determined and distributed by FRC's Operations supervisor.

89.     An important part of Mr. Franco's job was to attempt to ensure that the rice was milled in a sanitary manner, and to exercise quality control functions as the rice was sent either from the milling floor into the packaging room or from the milling floor into a silo for storage prior to packaging. Eventually, Mr. Franco noted systemic problems throughout Mills 1 and 2 involving pervasive mold, filth and improper blending, which he reported to his supervisors and FRC executives via verbal and written complaints.

90.     After FRC downsized its sanitation and housekeeping departments in 2007, Mr. Franco witnessed that the screws used to transport the rice within and between Mills 1 and 2 were not being cleaned. In general, when sanitation and housekeeping merged, the quality of work by both departments substantially decreased.

COMPLAINT (FALSE CLAIMS ACT)

91.     As early as 2008, Mr. Franco started making verbal complaints to FRC managers about mold, FMI, live insects, sanitation violations, and the improper blending of lower quality rice with higher quality rice. He complained directly to Mike Wagner, FRC's Manager for Pest Control and House Keeping; to John Konkle, FRC's Director of Operations at the time; and to Eddie Martinez, Special Processes Unit, among others. Mr. Franco's managers, however, did nothing to address his concerns.

92.     In 2011, Mr. Franco complained to his direct supervisor, Jorge Zayas, who seemed genuinely concerned about the quality of rice. In fact, Mr. Zayas told Mr. Franco that he emailed all of his superiors Mr. Franco's complaints. But, according to Mr. Zayas, no one at FRC responded to the emails or took any action.

93.     In or about 2009, Mr. Franco began documenting the unsanitary conditions in the Mills and silos, showing that FRC failed to take reasonable precautions to ensure that there was no contamination from any source in the production process, as required by 21 C.F.R. § 110.80.

94.     For example, Mr. Franco commonly found contamination as he walked his work space before each shift. He informed FRC management, in writing, that numerous screws were contaminated with mold and metal flakes. He was able to make photo-copies of only a fraction of his written complaints before placing them in the employee "suggestion box."

95.     The photo-copies he retained include:

- 3-10-2009: "To Mr. Wagner. Please check SC-75 [*i.e.*, Screw No. 75] SC-76. SC-76 has lots of mold and metal flakes it [will] contaminate our rice [sic]. L. Franco" [This complaint corresponds with the March 24, 2009 Daily Scheduling sheet which states "Don't process [-] on hold til days Mold Issues."];

- 12-4-2009: "Please someone check screws 75, SC-76, 77. Has a lot of mold and metal flakes. L. Franco";

- 2-20-2010: "Have some [one] check SC-24 and E-25, has a lots mold rice also SC-75, SC-76, SC-77. L. Franco";

25

COMPLAINT (FALSE CLAIMS ACT)

- 3-3-2010: "Please have someone check SC-24, E-25, SC-75, SC-76, SC-77. This very important. L. Franco";

- 10-4-2011: Please have pest control or sanitation look. High infestation of FMI [*i.e.*, Found Microscopic Insects] we need to kill all FMI. L. Franco";

- 11-12-2011: "Have someone check SC-31 DC-11 [*i.e.*, Dust Cooler No. 11]. I can't check it any more. It's been sealed with silicone and bolts. L. Franco"

- 12-2-2011: "I still see a lot of insects air lock-50 it may come from the roof screw SC-31 OF-11. L. Franco".

Exhibit 16.

96.     While submitting his written complaints, Mr. Franco continued to complain in person. For example, in or about mid-November 2011, he and Tom Ploetz, FRC's Plant Manager, discussed the mold and insects Mr. Franco found in Screw 31, which transports rice from the 3rd floor to the 4th floor. Although Mr. Franco made many complaints about this particular screw, nothing had been done about the contamination. Mr. Ploetz, however, further ignored Relator's complaints.

97.     In or about December 2011, Mr. Franco went over Mr. Ploetz's head to John Konkle, FRC's Director of Operations. He reported the same violations of the federal food regulations, specifically mentioning Screw 31. Mr. Konkle did not take action. In fact, Mr. Konkle had ordered certain screws, including Screw 31, to be sealed with bolts and silicone to keep Mr. Franco from further inspecting them back in or about September 2011.

98.     By doing this, FRC failed to hold food in a manner to prevent its contamination with bacteria, among other things.

99.     Similarly, Relator Bryant expressed her frustrations to FRC management regarding the existence of filth, metal shavings, FMI, live insects, and major equipment failures within the FRC facilities. She repeatedly complained in person to her supervisor, Hector Ramirez, and routinely emailed other supervisors despite being told by Mr. Ramirez not to make such comments.

COMPLAINT (FALSE CLAIMS ACT)

100.    When Ms. Bryant emailed Mr. Ramirez about such issues, he told her that he would forward her emails "up the chain."

101.    In another example, in a November 17, 2013 email, Ms. Bryant reported numerous issues to her supervisor, Mr. Ramirez, including "Live FMI" and "metal shavings in packed product," but FRC took no action.  Exhibit 17.

102.    In another example from May 2014, Ms. Bryant attempted to engage management concerning live red flour beetles infesting the transfer system and silos. Exhibit 18. Defendant failed, however, to take any measures to exclude pests from processing areas and protect against contamination of food by pests.  In response to this email, FRC employees fumigated the bin, but rather than destroy the contaminated rice, they simply reprocessed it through the Sortex. The Sortex, however, is not able to remove mold particles or bug larvae. Moreover, FRC never attempted to locate the source of the bug infestation.

103.    In another example from June 4, 2014, Ms. Bryant e-mailed Mr. Ramirez about FRC employees being pressured not to inform her when they found live insects. Exhibit 19. Employees were required to inform her because she was the Distribution Superintendent, but because they believed she would make a written report and the employee or a friend may get in trouble, they remained quiet about violations. "We have union and management conspiring to keep the truth from reaching anyone that will hold them accountable for doing their jobs."

104.    Additional observations by Relators and other FRC employees include windows and doors being propped open, allowing bugs, animals, birds and foreign materials access to both mills. The open windows and doors also allowed rain water in, which encouraged mold and moss growth. In one example, an apple pie box covered the sensor for the roll up door, keeping it open at all times. *See* Exhibit 20.

105.    In fact, some venting fans in the ceiling had no cover at all, allowing rain and animals access to exposed rice in Mill 2.  Exhibit 21.

106.    From the roof, Ms. Bryant and Supervisor Greg Huwes could see inside a rice silo, Bin No. 2, where approximately 1 inch of mold festered on the surface of the

27

COMPLAINT (FALSE CLAIMS ACT)

rice. Exhibit 22. Darwin Wiman was later reprimanded by management for showing Ms. Bryant this mold.

107.   In another example of rampant contamination, rice stored in FRC's off-site warehouses in or about 2013-14 was infested with mice. FRC management had the bright idea to use cats to catch the mice, exposing the rice to additional animals. Further compounding the problem, the cats had fleas and urinated and defecated in the rice.[5]

108.   Upon information and belief, the affected rice was New Variety, for which Coastal Pacific had a contract at that time for tens of thousands of pounds destined to the government. Exhibit 7.

109.    Violations like these resulted in listeria contaminating door knobs and other areas of the Mills in or about early 2015. FRC management did not shut the Mills down after listeria was detected, and never contacted the health department. In fact, Hector Ramirez threatened to fire anyone if they mentioned the listeria outside of FRC.

110.   Although FRC employees were provided a "Cleaning Building Check List," the employees simply did not take the time to properly clean the facility. Exhibit 23.

111.   FRC was able to get away with sanitation shortcuts because inspections were performed in house. For example, an in-house repair check list dated September 14, 2012, lists 34 items in the facility that need repair. Exhibit 24. Complaints include large amounts of water on the floor, lunch room trash cans not being emptied for weeks, shellers and other equipment broken or cracked for months, and the Sortex machine not working for six months or more.

112.   FRC's customers also complained to FRC about the insect problems. In one example, on May 27, 2014, Takatoshi Yoshiba, a Purchasing Manager at JFC International, complained to FRC that consumers of JFC brand rice, produced by FRC, continued to complain about insects, including moths, in the rice. Exhibits 25 and 26.

---

[5]  FRC employees, including but not limited to Pete Bianchini, were bit by the fleas, which caused illness and treatment at the U.S. HealthWorks Urgent Care facility.

28

COMPLAINT (FALSE CLAIMS ACT)

113.     Bryant found Mill 2 had bugs and mold and that the bins were "cleaned" by flushing old rice out with new rice. This was not the proper sanitation procedure. If FMI was found, for example, the rice was to be fumigated and placed through an aspiration process.

114.     Defendant failed to maintain buildings, fixtures, and other physical facilities in a sanitary condition, and failed to clean equipment in a manner that prevents contamination of food and food-contact surfaces.

**F.     Defendant Intentionally Blended In Sub-Standard Rice**

115.     FRC claimed that its New Variety rice was a premium high-quality rice, superior over other medium-grain varieties and sold at a higher price. FRC sold New Variety rice under the tradenames JFC, Nishiki and Diamond G. Diamond G was the brand most commonly sold to government agencies.

116.     During his employment at FRC, Mr. Franco witnessed "thousands of sacks" of New Variety rice inappropriately mixed with flush[6] or "Extra Fancy" rice, an inferior blend of rice. He also witnessed this rice being distributed to government agencies.

117.     Ms. Bryant also witnessed this misbranded rice distributed to the military. In fact, FRC employees were instructed by Andrew Brutleg and Hector Ramirez that rice sold to the military could be out of grade. They explained that FRC's in-house brand, Diamond G, was an FRC product and therefore FRC could mill and package it however FRC saw fit.

118.     Exhibit 27 is one example of a Daily Scheduling sheet which instructs the Miller to blend in a remaining old crop of reprocessed rice into the batch to make a new crop of New Variety rice. This blend resulted in old, inferior rice being mixed with new New Variety rice. This December 9, 2010 Daily Scheduling sheet instructs the Miller to "cut in the remaining old crop" that has been reprocessed ("repro") from bin "105" with New Variety rice (NV) or "any Calrose to get bin empty."

---

[6] Flush rice consists of an old crop of rice that remains at the bottom of storage silos which is often broken, damaged, comingled rice that is out of grade; or rice that needs to be reprocessed, often stemming from previously rejected orders.

COMPLAINT (FALSE CLAIMS ACT)

119.   This is evidence that bin 105 was not New Variety rice, but rather an old crop of mixed, reprocessed rice. Although labeled "New Variety New Crop," it is clearly not a "New Crop" as the "remaining Old Crop" is being cut into the New Variety New Crop rice.

120.   Another example of fraudulent blending appears on a Mill 2 Daily Scheduling sheet Dated December 27, 2009. Exhibit 28. Milling instructions state to "[mill] ¼% MG extra fancy new crop and to 'cut in bulk bags from paddy' whse 1." Importantly, the instructions state: "use Japan rice til midnight. Call everything Extra Fancy til midnight, then roll bulk scale for Japan."

121.   Franco also made notes of his conversations regarding Defendant's illegal blending practices. On October 4, 2011, he spoke with FRC executives Ray Belli, FRC's Foreman of Exports, and Tom Ploetz, FRC's plant manager, regarding FRC's practice of blending "on hold" rice with newly processed rice. Exhibit 29. Rice "on hold" is rice that does not meet rice grading requirements and the order is rejected by the customer. Documentation of rejection pulls are indicated in Exhibits 30 and 31.

122.   On December 21, 2011, Mr. Franco reported to Mr. Ploetz that rice packaged as New Variety was not that grade, but was instead Extra Fancy. Exhibit 16.  Mr. Franco could see "chalk," on the rice, which is the term used for rice that is immature. Mr. Ploetz told Franco not to worry about it. Exhibit 16.

123.   FRC operated under centrally-controlled and uniform policies, practices, and representations regarding the type and quality of rice it packaged and sold in various markets.

124.   As part of their operation, Defendant has been knowingly submitting and/or causing the submission of false claims, and knowingly using and/or making false records that are material to false or fraudulent claims paid by federal government food programs that include, but are not limited to, the Defense Commissary Agency, Farm Service Agency and the United States military via Coastal Pacific Food Distribution Inc., among others

30

COMPLAINT (FALSE CLAIMS ACT)

125.    All of the false claims and statements at issue with contracts between Defendant Farmers' Rice Cooperative and the United States in this action were made or caused by Defendant in connection with, or operating through its agencies.

126.    Defendant knowingly submitted the above cited fraudulent claims in so far as they had actual knowledge, acted in deliberate ignorance, and/or acted in reckless disregard of the truth or falsity of the information.

127.    The false records, statements, representations, and/or omissions were material to obtaining payment, and the United States would not have paid the claims had it known of Defendant's fraudulent representations, records, statements, and/or omissions.

128.    FRC's non-compliant actions include, but are not limited to:

(vi)    Milling, processing and packaging rice in moldy, filthy conditions;

(vii)   Storing rice in silos containing mold, "Found Microscopic Insects" ("FMI"), rice weevils, rodents, and other contaminates;

(viii)  Blending in lower quality and/or adulterated rice to increase the volume of more expensive rice, which resulted in false and deceptive certifications of rice grades;

(ix)    Violating minimum standards, which resulted in non-conforming goods and adulterated foods; and

(x)     Concealing the subpar quality of rice through misbranding, fraudulent labeling and packaging.

129.    As a result of their fraudulent conduct, Defendant received millions of dollars from government funded programs that include, but are not limited to, the Defense Commissary Agency, and Farm Service Agency. This conduct caused the United States to sustain a direct loss of funds and damage to their interests.

### **COUNT I**

### **(Federal False Claims Act - 31 U.S.C. § 3729(a)(1)(A))**

130.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

131.    As set forth above, Defendant knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made false representations about the quality of the goods

COMPLAINT (FALSE CLAIMS ACT)

supplied to government agencies at the time of their sale to the government agencies, including that the services complied with state and federal regulations and/or contracts entered into between Defendant, third-parties, and/or the United States.

132.    Defendant's misrepresentations were capable of influencing and thus material to the government agencies' decisions about purchasing FRC's goods.

133.    The government agencies have incurred losses as a result of Defendant's misrepresentations in the form of paying for inadequate, worthless, and/or spoiled goods.

134.    By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(A), for each of the goods sold to the government agencies in violation of state and federal regulations, Defendant knowingly, or acting in deliberately ignorance and/or in reckless disregard of the truth, presented a fraudulent claim for payment or approval.

135.    Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Defendant is liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation committed by Defendant on or before November 2, 2015, and not less than $11,181.00 and not more than $22,363 for each violation committed by Defendant after November 2, 2015, plus three (3) times the amount of damages which the United States has sustained because of Defendants' actions.

## COUNT II

### (Federal False Claims Act - 31 U.S.C. § 3729(a)(1)(B))

136.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

137.    As set forth above, Defendant knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made false representations about goods supplied to government agencies at the time of their sale to the government agencies, including that the goods complied with state and federal regulations and/or contracts entered into between FRC, third-parties, and/or the United States.

138.    Defendant's misrepresentations were capable of influencing and thus material to the government agencies' decisions about purchasing FRC's goods.

139.    The government agencies have incurred losses as a result of Defendant's

32

COMPLAINT (FALSE CLAIMS ACT)

misrepresentations in the form of paying for inadequate, worthless, and/or spoiled goods.

140.    By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(B), for each of the goods sold to the government agencies in violation of state and federal regulations, Defendant knowingly, or acting in deliberately ignorance and/or in reckless disregard of the truth, presented a fraudulent claim for payment or approval.

141.    Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Defendant is liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation committed by Defendant on or before November 2, 2015, and not less than $11,181.00 and not more than $22,363.00 for each violation committed by Defendant after November 2, 2015 , plus three (3) times the amount of damages which the United States has sustained because of Defendants' actions.

## COUNT III

**(Violation of the False Claims Act: Reverse False Claims - 31 U.S.C. § (a)(1)(G))**

142.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

143.    Plaintiff seeks relief against Defendant under Section 3729(a)(1)(G) of the False Claims Act, for all false and fraudulent claims that Defendant caused to be presented.

144.    Accordingly, as set forth above, Defendant knowingly caused to be made or used false records and/or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the United States. Thus, the United States has incurred losses to be determined at trial.

145.    Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Defendant is liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation committed by Defendant on or before November 2, 2015, and not less than $11,181.00 and not more than $22,363.00 for each violation committed by Defendant after November 2, 2015, plus three (3) times the amount of damages which the United States has sustained because of Defendants' actions.

COMPLAINT (FALSE CLAIMS ACT)

**PRAYER FOR RELIEF**

**WHEREFORE, Relator, on behalf of himself and the United States, requests the following relief:**

    a.    Ordering Defendant to cease and desist from violating 31 U.S.C. § 3729 *et seq.* and all other unlawful practices alleged herein;

    b.    A judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's violations of the False Claims Act;

    c.    A judgment against Defendant for a civil penalty of $11,000 for each of Defendant's violations of the False Claims Act committed on or before November 2, 2015;

    d.    A judgment against Defendant for a civil penalty of up to $22,363.00 for each of Defendant's violations of the False Claims Act committed after November 2, 2015;

    e.    Attorneys' fees, expenses and costs of suit herein incurred by or on behalf of the Relator under the FCA; and

    f.    Awarding Relator the maximum allowed under 31 U.S.C. § 3730(d);

    g.    Awarding Relator pre-judgment interest; and

    h.    Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Relator hereby demands that this matter be tried before a jury.

Dated: July 12, 2019

               Respectfully submitted,

               Clayeo C. Arnold, A Professional Law Corporation
               M. Anderson Berry, Esq.
               Leslie Guillon, Esq.

               M. Anderson Berry, Esq.
               Attorney for Relators Luis Franco and
               Monique Bryant

34

COMPLAINT (FALSE CLAIMS ACT)